FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.
2008 MAY -7 AM 11: 23
CLERK
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA

v.

CASE NO.: CR207-33

KALVIN LASHAWN MANGRAM
DENNIS MITCHELL

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Kalvin Mangram ("Mangram") is charged with being a convicted felon in possession of a firearm and an armed career criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), and being in possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1). Defendant Dennis Mitchell ("Mitchell") is charged with being a convicted felon in possession of a firearm and an armed career criminal, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Mangram and Mitchell each filed a Motion to Suppress, and the Government responded. The undersigned conducted an evidentiary hearing on February 19, 2008, at which Officer Roderick Nohilly, formerly of the City of Brunswick Police Department, testified. Mitchell filed a post-hearing brief, to which the Government responded. For the reasons which follow, Mangram's and Mitchell's Motions should be **DENIED**.

## FINDINGS OF FACT

The credible testimony at the evidentiary hearings[1] and a review of the videotape established the following:

Just after midnight on April 14, 2005, Officer Roderick Nohilly ("Nohilly") was on patrol. Nohilly was traveling east on L Street to assist another officer on Amherst Street. As he was driving, he noticed a blue 1991 Oldsmobile Cutlass turn left from L Street onto Amherst which failed to yield the right of way to a minivan; the person driving the minivan had to slam on the brakes to avoid a collision. Nohilly initiated a traffic stop of the Oldsmobile by activating his blue lights. After stopping the vehicle, Nohilly approached the vehicle on the driver's side and asked the driver for his license. Nohilly noticed that there were beers in the car, including an open container in the possession of the passenger, Mangram. Nohilly asked the driver, Mitchell, to give him the beers, and he did so. Nohilly placed the beers on top of the car. Nohilly explained to Mitchell and Mangram that it was against the law to have an open container of alcohol in a vehicle. Mitchell stated that he had not been drinking. Mitchell also stated that the vehicle belonged to a friend of his. Nohilly asked Mangram if he had any identification, and Mangram said he did not. Nohilly testified he wanted to ensure Mangram was able to drink beer legally. (CR207-33, Hr'g Tr., p. 8). Nohilly also testified that he originally was going to write Mangram a citation for having an open container, and this is why the other officer asked Mangram for his name and date of birth. (CR205-32, Hr'g Tr., p. 30). Nohilly further testified that, at the time the beers

---

[1] The undersigned has taken judicial notice of Nohilly's testimony offered at the evidentiary hearing conducted on October 25, 2005, in Case Number CR205-32. Much of the Findings of Fact have been taken from the undersigned's Report and Recommendation in Case Number CR205-32, and the relevant testimony from the February 2008 hearing has been added.

were taken out of the car, he had not determined whether he was going to arrest either or both of the Defendants for the open container offense. (CR207-33, Hr'g Tr., p. 26). Nohilly testified that he could arrest a person who possessed an open container under Georgia law.

Nohilly returned to his patrol car for several moments, presumably to run Mitchell's driver's license and the license plate found on the car. Nohilly approached the car again[2], and he and Mitchell went to the back of the vehicle. Nohilly explained the traffic citation to Mitchell, had Mitchell sign the citation, and handed the citation to Mitchell. Nohilly then approached the passenger's side of the vehicle to speak with Mangram. Mangram did not have any identification with him[3] but told Nohilly that his date of birth was September 4, 1976; however, the dispatch operator again informed Nohilly that Kalvin Mangram's date of birth was September 14, 1976. Nohilly asked Mangram about the discrepancy between these dates, and Mangram insisted that his date of birth was September 4, 1976. Mangram also informed Nohilly that he had been on probation before but was not at that time. Nohilly attempted to verify Mangram's information with the dispatcher, who again informed Nohilly that Mangram's date of birth was September 14, 1976, and that he was currently on probation based on the

---

[2] Based on a review of the videotape, another officer approached the passenger's side of the car, presumably to ask Mangram about his date of birth, after Nohilly returned to his patrol car. This is supported by Nohilly's testimony. (CR205-32, Hr'g Tr., p. 12).

[3] During the time Nohilly's audio device was not operational and an officer approached the vehicle a second time (note 2), it appears that officer asked Mangram for his name and date of birth. This seems to be the case given the events which followed when Nohilly's audio device was operational once Nohilly approached the car the third time. After Nohilly asked Mangram for his name and date of birth, Mangram informed him that his birthdate was September 4, 1976. Nohilly asked Mangram, "You wouldn't be lying to me, would you?" The videotape indicates that Nohilly had asked the dispatcher for this information previously while he was in his patrol car, which was audible from the microphone in Nohilly's car. The dispatcher informed Nohilly that Mangram's date of birth was on record as being September 14, 1976.

commission of a felony offense. Nohilly placed handcuffs on Mangram, put him in the back of another officer's patrol car, and informed Mangram that he was under "investigative detention" while the date of birth discrepancy was clarified. Nohilly spoke with someone with the Glynn County Detention Center who informed him that September 4, 1976, was the date of birth on file for a Kalvin Mangram. However, the physical description associated with this person did not match Mangram's physical characteristics. Nohilly testified that the dispatcher would have had Mangram's information from the National Crime Information Center and the Georgia Crime Information Center ("NCIC" and "GCIC"), which was what he (Nohilly) would have to rely upon at that time. Nohilly stated that Mangram was under arrest for providing false information to a police officer.[4]

Nohilly again approached Mitchell and asked if he could take a look in the car "real quick." Mitchell informed him that the car was not his. Nohilly testified that he knew he could search the vehicle, even in the absence of Mitchell's consent, and asked for Mitchell's consent to gauge his reaction to the request. Nohilly and Officer Wilson proceeded to search the vehicle. A bullet and gun pellets were found under a piece of paper in the car[5], and Nohilly asked Mitchell if he were a convicted felon. Mitchell stated that he had been in trouble before but did not directly answer Nohilly's question. Nohilly then informed Mitchell that he was under investigative detention until the officers could determine why there was ammunition in the vehicle. Officers continued searching

---

[4] The Glynn County Detention Center had both September 4 and September 14, 1976, as dates of birth on record for Mangram stemming from different arrests. (CR207-33, Hr'g Tr., p. 12).

[5] Mitchell asserts that one of the officers remarked during the search of the car that he "knew there was one in there" further indicates the officers had no reason to question Mangram but wanted another "reason" to justify the search. (Doc. No. 76, p. 12). However, this comment was made after the bullet was found. Nohilly testified he figured a gun (the "one" in Mitchell's quote) would be in the car because bullets typically accompany a gun. (CR205-32, Hr'g Tr., p. 14).

the vehicle. A firearm was found under Mangram's seat and another firearm was found under the middle portion of the front seat.

## DISCUSSION AND CITATION TO AUTHORITY

I. **Fourth Amendment Analysis**

There are three types of police-citizen encounters "which invoke the [F]ourth [A]mendment: police-citizen communications involving no coercion or detention; brief seizures or investigative detentions; and full-scale arrests." United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989). Investigative detentions involve "reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave." Id. (citing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). "In order to justify a [F]ourth [A]mendment seizure, the government must show a reasonable and articulable suspicion that the person has committed or is about to commit a crime. . . [I]f the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause." Id. "[A]n arrest [supported by probable cause] must be objectively reasonable based on the totality of the circumstances." United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003). The probable cause standard "is met when the facts and circumstances within the officer's knowledge, of which he . . . has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (internal citation and punctuation omitted). Probable cause "requires more than suspicion," but "does not require convincing proof, and need not

reach the same standard of conclusiveness and probability as the facts necessary to support a conviction." Id.

"A warrantless search is *per se* unreasonable under the Fourth Amendment unless it falls within one of several specifically established and well-delineated exceptions." Holmes v. Kucynda, 321 F.3d 1069, 1082 (11th Cir. 2003) (citing Mincey v. Arizona, 437 U.S. 385, 390, 98 S. Ct. 2408, 2412, 57 L. Ed. 2d 290 (1978)). "A search incident to [an] arrest is one of these exceptions." Id. A search incident to an arrest requires no additional justification, "[s]ince it is the fact of custodial arrest which gives rise to the authority to search." United States v. Robinson, 414 U.S. 218, 235, 94 S. Ct. 467, 477, 38 L. Ed. 2d 427 (1973). "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" and "may also examine the contents of any containers found within the passenger compartment[.]" New York v. Belton, 453 U.S. 454, 460, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768 (1981); Thornton v. United States, 541 U.S. 615, 620, 124 S. Ct. 2127, 2130-31, 158 L. Ed. 2d 905 (2004).

### A.  Mangram's Motion to Suppress

Mangram asserts his Fourth Amendment rights were violated because Officer Nohilly questioned him after Officer Nohilly had written the citation for failing to yield and given Mitchell's driver's license back to him. Mangram contends that Officer Nohilly had no legally permissible reason to question him after Mitchell had been given the citation and his license. Mangram also contends the vehicle in which he and Mitchell were riding was searched without probable cause.

In the case *sub judice*, Nohilly stopped the car Mitchell was driving due to his failure to yield the right of way to oncoming traffic. Once he approached the car, Nohilly noticed an open container of beer in the possession of Mangram. Nohilly testified that he could have arrested Mangram for having possession of an open container.[6] While Nohilly testified that he did not intend to pursue the open container issue with Mitchell, there is no evidence before the undersigned that Nohilly did not have the intention of pursuing this offense further with Mangram when Nohilly first noticed the beers. In addition, when Nohilly first approached the car, he asked Mangram whether he had any identification; Mangram said he did not. As discussed in note 2 of this Report, it appears that an officer asked Mangram for his date of birth on an occasion prior to Nohilly approaching the passenger's side of the car. Having already observed Mangram in possession of an open container of beer, Nohilly was permitted to prolong the stop. See United States v. Boyce, 351 F.3d 1102, 1107 (11th Cir. 2003) (noting that once a traffic stop has been completed, the officer should allow the driver to go unless the officer had a reasonable and articulable suspicion of some other criminal wrong doing). It was during the time Nohilly spoke with Mangram on the passenger's side of the vehicle that he attempted to confirm Mangram's birth date through the dispatcher and then the Glynn County Detention Center. Nohilly testified that he was supposed to follow what the dispatcher told him because her information would have been from the NCIC/GCIC records. Because there was still a discrepancy between what Mangram

---

[6] "A person shall not: (A) Consume any alcoholic beverage; or (B) Possess any open alcoholic beverage container in the passenger area of any motor vehicle which is on the roadway or shoulder of any public highway." O.C.G.A. § 40-6-253(b)(1). A violator of this Code section is subject to a fine not to exceed $200.00. O.C.G.A. § 40-6-253(c).

AO 72A
(Rev. 8/82)

insisted was his date of birth and what the dispatcher told Nohilly Mangram's date of birth was, it was permissible for Nohilly to put Mangram in handcuffs and place him in another officer's patrol car. Pursuant to O.C.G.A. § 16-10-25, "A person who gives a false name, address, or date of birth to a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identity or birth date is guilty of a misdemeanor." Although Nohilly informed Mangram that he was being placed under "investigative detention", this detention actually appears to be an arrest, as Mangram was handcuffed and placed in the back of a patrol car; Mangram's arrest was supported by probable cause. See Hastamorir, 881 F.2d at 1556; Dunn, 345 F.3d at 1290.

It is irrelevant that Mangram was not ultimately charged with a violation of section 16-10-25 once Nohilly took him to the Glynn County Detention Center. It was Nohilly's belief *at the time* of this incident that is relevant to the undersigned's analysis. Notably, when the undersigned asked Nohilly at the October 25, 2005, evidentiary hearing for what offense or offenses had Mangram been arrested, Nohilly replied that Mangram was arrested for giving false information. Officers were permitted to conduct a search of the vehicle in which Mangram was a passenger as incident to Mangram's lawful arrest. See Belton, 453 U.S. at 460, 101 S. Ct. at 2864; Thornton, 541 U.S. at 620, 124 S. Ct. at 2130-31.

Mangram cites to Knowles v. Iowa, 525 U.S. 113, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998), and United States v. Pruitt, 174 F.3d 1215 (11th Cir. 1999), as support for his contention that Officer Nohilly's actions were violative of the Fourth Amendment. In Knowles, the Supreme Court determined that the search of defendant's vehicle was

AO 72A
(Rev. 8/82)

8

unconstitutional. The Supreme Court stated that "[o]nce Knowles was stopped for speeding and issued a citation, all the evidence necessary to prosecute that offense had been obtained. No further evidence of excessive speed was going to be found either on the person of the offender or in the passenger compartment of the car." Knowles, 525 U.S. at 118, 119 S. Ct. at 488. While it is clear that the portion of the stop relating to the traffic violation concluded when Nohilly gave Mitchell the citation for failure to yield, Nohilly's continuing detention of Mitchell and Mangram had not, as noted above. Nohilly noticed that Mangram had possession of an open container of beer, and Nohilly had evidence before him that there was a discrepancy between what Mangram reported his date of birth as being and the information the dispatcher had; this occurred (Videotape, 43:26) before Nohilly gave Mitchell his driver's license back and the citation for failing to yield the right of way. (Id. at 47:20). Nohilly's questioning of Mangram and resulting detention of him were related to information Mangram had provided him. Knowles is factually distinguishable from the instant case and does not lend support to Mangram's assertions.

Likewise, Pruitt does not support Mangram's contention that the search at issue violated his constitutional rights. The Eleventh Circuit reasoned that "once an officer has briefly stopped a motor vehicle operator for the purpose of issuing a traffic violation, . . . the officer's continuing detention of the vehicle's occupants is authorized under the Fourth Amendment only if the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Pruitt, 174 F.3d at 1219 (internal citation and punctuation omitted). Unlike the officer involved in the Pruitt case, Nohilly had specific and articulable facts (i.e.,

Mangram had possession of an open container of beer, and, at the time of the incident, Nohilly had reason to believe Mangram provided him with false information concerning his date of birth) which permitted his continuing detention of Mitchell and Mangram. Accordingly, Mangram's Motion to Suppress should be denied.

### B. Mitchell's Motion to Suppress

Mitchell asserts Officer Nohilly took control over the beers after he approached the car Mitchell was driving. Mitchell contends Officer Nohilly testified he did not intend to arrest Mitchell or Mangram for having an open container. Mitchell also contends Officer Nohilly had no reason to ask about Mangram's name or date of birth since he did not intend to arrest either Mitchell or Mangram for the open container violation. Mitchell alleges when Officer Nohilly told another officer he was going to see if Mitchell would let him search the car, he had not asked Mangram his name or date of birth, which indicates Officer Nohilly's "knowledge that he did not have a reason to search but hoped beyond hope that Mr. Mitchell would agree to a consensual search." (Doc. No. 76, p. 12). Mitchell also alleges an officer's remark during the search that he "knew there was one there" further indicates Officer Nohilly did not have reason to question Mangram but "wanted to bootstrap a reason to justify" the search. (Id.)

The Government contends Officer Nohilly easily could point to the violation of having an open container as an ongoing criminal activity that he investigated in the discharge of his official duties. The Government also contends this Court has already explained its understanding of Knowles and United States v. Boyce, 351 F.3d 1102 (11th Cir. 2003)[7], in Case Number CR205-32, and there are no new facts or authorities

---

[7] In CR205-32, the undersigned noted that: "[t]he Boyce court reasoned that an officer cannot base his decision to prolong a traffic stop on the 'detainee's refusal to consent to a search. Such a refusal may

to lead the Court to change its previous ruling. The Government further contends the Court has also ruled on Mitchell's assertion that, because a violation of the open container law is an offense for which the police may issue a citation, it is not an arrestable offense. The Government maintains the Court should render the same rulings it did in the previous case.

The Court has already addressed Mitchell's assertions based on <u>Knowles</u> and <u>Pruitt</u> in CR205-32, as well as in Section I.A of this Report. However, the undersigned points out that Mitchell seems to have omitted some of the events which were videotaped during the traffic stop. It took Mitchell approximately 15 seconds to pull over once the traffic stop was initiated and the videotape was activated. Less than two (2) minutes into the stop, Officer Nohilly asked Mangram if he had any identification. Mangram stated he did not, and Officer Nohilly told him to "hang tight." (Videotape, 30:32). Two (2) minutes after that, an officer approached Mangram's side of the vehicle and asked him for what appears to be his name and date of birth.[8] Prior to having Mitchell sign the citation for failing to yield the right of way to another vehicle (<u>Id.</u> at 47:20), Officer Nohilly was in contact with dispatch regarding Mangram's date of birth. (<u>Id.</u> at 43:26, 46:03). Officer Nohilly then approached Mangram again about one (1) minute later to clarify the discrepancy between what Mangram said his date of birth was and what the dispatcher said Mangram's date of birth was; Officer Nohilly said to

---

only be considered when the police have already observed, before asking for permission to search, facts sufficient to raise a reasonable suspicion.' <u>Boyce</u>, 351 F.3d at 1110. As discussed in the body of this Report, Nohilly observed facts sufficient to raise a reasonable suspicion of illegal activity on the part of Mangram. <u>Boyce</u> is distinguishable from the instant case. Mitchell's failure to consent to the search of the vehicle is a non-issue." (CR205-33, Doc. No. 66, p. 7 n.5).

[8] The officer who approached Mangram did not look like Officer Nohilly. The undersigned's assumption that this officer asked Mangram his name and date of birth is supported by Officer Nohilly's testimony that another officer approached Mangram and asked him for this information.

AO 72A
(Rev. 8/82)

11

Mangram, "You wouldn't be lying to me, would you?". (Id. at 48:28). At this time, Mangram provided Officer Nohilly with his Social Security Number. Mangram's date of birth still came back from dispatch as being September 14, 1976, not September 4, 1976, as Mangram insisted. (Id. at 51:19). Officer Nohilly informed Mangram that his date of birth kept coming back from dispatch as September 14, 1976, and, because Mangram did not have any identification to prove this information incorrect, Officer Nohilly placed him under "investigative detention" by placing him in the back of his patrol car. (Id. at 53:29). Officer Nohilly tried at least once more after Mangram was in the back of his patrol car to verify Mangram's date of birth. (Id. at 55:53). Mangram's date of birth came back this time as being September 4, 1976, but the description the dispatcher gave Officer Nohilly did not match Mangram's appearance. (Id. at 56:48-57:48). Officer Nohilly testified that he still does not know what Mangram's correct date of birth is.

Mitchell contends Officer Nohilly repeated several times at the February 2008 hearing that he had no safety concerns other than those concerns ordinarily attendant to a traffic stop. The undersigned presumes Mitchell makes this contention to support his argument that, because Officer Nohilly had no heightened reason to fear for his safety, he should not have asked Mangram any questions, which prolonged the stop past any legally permissible boundaries. In support of this contention, Mitchell cites Maryland v. Wilson, 519 U.S. 408, 114 S. Ct. 882, 137 L. Ed. 2d 41 (1997), and Holt v. State, 227 Ga. App. 46, 487 S.E.2d 629 (1997). Wilson and Holt, however, clearly are distinguishable from the facts before the Court.

The facts of Wilson are that an officer observed a car traveling above the posted speed limit without a regular license plate but with a rental car tag "dangling from [the car's] rear." 519 U.S. at 410, 177 S. Ct. at 884. The officer initiated the traffic stop by activating his lights and sirens, and the vehicle continued for one and a half miles before stopping. While the officer was in pursuit of the vehicle, he noted there were two passengers who "turned to look at him several times, repeatedly ducking below sight level and then reappearing." Id. The driver got out of the car, and after producing a valid driver's license, the officer asked him to get the rental documents from the car. When the driver was doing this, the officer noticed that the front-seat passenger was sweating and "appeared extremely nervous." Id. at 410-11, 177 S. Ct. at 884. The officer ordered the passenger to get out of the car while the driver was looking for the rental papers; when the passenger did so, a quantity of crack cocaine fell to the ground. The Supreme Court reversed the Maryland Court of Special Appeals' decision that the officer ordering the passenger out of the car was an unreasonable seizure under the Fourth Amendment. The Supreme Court held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Id. at 415, 117 S. Ct. at 886. In so holding, the Supreme Court reasoned that:

> danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver of the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal.

Id. at 414-15, 117 S. Ct. at 886.

An officer stopped a "suspicious vehicle" with a cracked windshield containing three males "slowly creeping" through an office complex where there had been previous

reports of entries into cars are the facts underlying the decision in Holt. 227 Ga. App. at 46, 487 S.E.2d at 630. The officer stopped the vehicle because the males "did not appear to have any apparent purpose except to be driving around during normal business hours." Id. at 47, 487 S.E.2d at 630. When the officer returned to his car to write the driver citations for driving with a cracked windshield and without proof of insurance, he watched the passengers and thought they "were nervous about something." Id. The officer asked the passengers if they had any identification on them; the passengers said they did not. The officer, "[b]elieving that every citizen is supposed to have some type of" identification with them, and wanting to see if the passengers were wanted and to have their names on file for future reference, asked the passengers for their names and dates of birth. Id. One of the passengers had given the officer a false name and date of birth, and the officer arrested the passenger for violating O.C.G.A. § 16-10-25, providing false information to a law enforcement officer in the lawful discharge of his official duties. The Georgia Court of Appeals reversed the passenger's conviction based on a violation of section 16-10-25 because that court did not find the officer was "lawfully discharging his official duties" when he questioned the passengers, as the officer could not "articulate a particularized reason for questioning the passengers and did not have a belief the passengers were "engaging in, or [were] about to engage in criminal activity." Id. at 50, 487 S.E.2d at 632.

As discussed in the preceding section of this Report, Officer Nohilly was legally permitted to prolong the stop. Officer Nohilly made a proper traffic stop, and, upon approaching Mitchell, he noticed Mangram was in possession of open containers of beer. Officer Nohilly testified he wanted to make sure Mangram was not underage, and

that is why he asked Mangram for his date of birth. The asking of Mangram for his date of birth and attempting to verify that information led Officer Nohilly to believe, at the time[9], that Mangram provided him with false information. Wilson and Holt do not provide support for Mitchell's assertions.

As to Mitchell's assertion that Officer Nohilly should have given Mitchell back his license and released him or issued a citation and released him, this assertion, too, is without merit. See Virginia v. Moore, ___ U.S. ___, 2008 WL 1805745, *9 (April 23, 2008) (reaffirming that, when officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest, even if that arrest is not permitted by state law).

Mitchell's Motion to Suppress should be denied.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that the Motions to Suppress filed by Mangram and Mitchell be **DENIED**.

**SO REPORTED** and **RECOMMENDED**, this ___7th___ day of May, 2008.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

---

[9] The Court notes Officer Nohilly stated he wanted to see if Mitchell would let him search the vehicle prior to actually trying to verify Mangram's date of birth; however, even if Officer Nohilly had a subjective motive in place, his detention of the Defendants was supported by probable cause, and thus, is constitutionally permissible. See Bruce v. Beary, 498 F.3d 1232, 1242 n.19 (11th Cir. 2007) (quoting Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996), for the proposition that subjective intentions play no role in the ordinary probable cause Fourth Amendment analysis).